Chief Judge Conway
(dissenting). The accident here involved occurred on December 27, 1951. Prior to April, 1944 there had been STOP signs on the approaches to the State highway from both east and west on the county road, but on March 31, 1944 the sign on the approach from the west was ordered removed by an order of the State Traffic Commission. A STOP. sign remained on the approach from the east. On the west approach at about 43 feet from the intersection there was erected a route marker containing the legend “ N. Y. 13 L-B ’ ’. There was no other sign or marker on the west approach. The instant collision took place at about 3:30 and 4 o ’clock in the afternoon on a blustery wintry day with the wind blowing snow across the highways in gusts. One Charlotte Sebring, who was unfamiliar with the road intersection, was traveling easterly on the county road so that as she approached the intersection the only sign confronting her was the route marker sign erected on the west approach to the State highway. When her automobile entered upon the State highway it was struck by the car of one Merton Ladd who was traveling from north to south on the State highway.
It is clear that the State may not escape liability for failure to have a STOP sign on the west approach to the State highway merely because the Traffic Commission considered a STOP sign, unnecessary on such approach. Section 8 of the Court of Claims Act and the cases interpreting it clearly establish the principle that the question to be answered when the State is a defendant is the same as that in an action against an individual or corporation, viz.: Did the defendant State act in the manner which. *10 the circumstances reasonably' demanded in the1, exercise of good, judgment ? If not,, the-. State, is liable under section 8: of the Court, of Claims Act for its- negligence:. It. seems- clear, to: me that in setting up the Traffic Commission the Legislature merely intended to delegate to the commission general jurisdiction ©ver. one: phase, of the- State’s duty to maintain the' highways hr a-reasonably- safe condition for trave-l at. all" times,., i..e., the duty to- give adequate warning of dangerous conditions; to> highway-travelers and the duty to- regulate traffic,. Certainly we eanwb hold that the Traffic Commission; may never- order: the. removal of a traffic device', without subjecting the State- to liability in negligence. By the same token, however, neither may we hold that- the commission- may remove and fail to- replace- such- a device (Tj where the physical1 condition- of the road has not changed1, (2): the traffic conditions are the' same or worse, and" (3)' there-is* sufficient evidence to-establish that the intersection in question continues to be dangerous in nature and by such-act excuse the State from liability in1 negligence.
Ih the present"case the Traffic Cbmmission removed’ a-ndf failed to replace the- STOP" sign on the west approach to- the"- State-highway even though (1) the-physical-condition of ’ the roads had not changed; ('2)-- the traffic conditions were the same or worse, and (3) there1 was sufficient evidence-to-establish that the intersection- in1 question- continued to he- dangerous1 in nature. State’s witness Schultze, senior civil engineer in charge- of maintenance'for1 Cortland County; testified that from- the time the STOP"' sign was1 removed" in 1944 until 1950’ traffic- had" increased rapidly on the State' Highway: Moreover, there was-an additional increase since11950". The witness further testified that he “’wouldn’t" know-” if traffic-had- also increased on the1 county road but that’ “tit could be assumed’ there1 would- be" a' slight increase on that road also.”
There is evidence- in the record to the- effect that no accident had. ever, occurred'at the intersection involving a ear proceeding westerly on the county-road: As stated' above; that approach- to-the Highway was, at all times since 1944’,. protected by a' STOP sign located at* the northeast1 corner. Similarly-, according to; the recollection of State’s witness Schultze,- no1 accident1 had ever occurred at the intersection involving a1 ear1 proceeding easterly on the county road2 during the time that the STOP1 sign pro *11 teeted those traveling in such direction. However, after the removal of the STOP sign eight or nine accidents took place at the intersection involving cars proceeding easterly on the county road. Although there is no factual proof of how some of them occurred and in some instances where there is prooi the circumstances differ from those here, such evidence is not totally without significance as demonstrating the dangerous nature of the intersection, particularly since there is proof of a suggestion made to State’s engineer Schultze by a State police officer, who had investigated accidents at the intersection, that a STOP sign be erected at the southwest corner of the intersection and proof of complaints from residents of the neighborhood around the scene of the accident to the State police about the absence of a STOP sign at the southwest corner of the intersection.
There can be no doubt but that the traveler on the county road was entitled to notice or warning that he was about to cross the State highway. The State’s position is that the route marker bearing the legend “ N. Y. 13 L-B ’ ’ was an adequate warning sign. I cannot concur in that thought. A route sign is a sign of information; it is not a warning sign. As claimant’s civil engineer testified: “ There’s quite a distinction between the two [types of signs]. However, there are occasions when the route sign is allowed to partake somewhat of the functions of a warning sign category, but in this instance the location of the sign [about 43 feet from the intersection] is entirely too close to indicate to traffic that a stop should be necessary, and due to these conditions I have mentioned, and looking at Exhibit 18, it would be very difficult from this viewpoint to tell just where the road is. It’s not apparent to me that it is, in looking at this exhibit, except that the top of these guideposts [along the State highway] may be seen just protruding through the snowbank and, from this distance that this picture is taken the location of pavement itself is not too apparent. The placement of the stop sign possibly with a sign 1 Stop Ahead ’ three or four hundred feet ahead in advance of the intersection would certainly be sufficient warning and give the motorists time under these conditions of snowy roads and slippery surface to slow down sufficiently to control his car at the intersection and come to a stop.”
*12 The reasons for the necessity of a STOP sign, as distinguished, from the route marker, at the southwest corner of the intersection have, to my mind, also been accurately stated by the Appellate Division in the following words:
“As one approaches the hamlet [of Cuyler] moving in an easterly direction on the county road, considerable stretches of the State highway are visible on either side, but as one gets closer to the highway the physical arrangements tend to mask the adjacency of the State highway, and, indeed, its existence.
“ One photograph, taken in winter with some more snow on the ground than at the actual time of the accident here involved [claimant’s Exhibit 18 taken the day following the accident], with the camera 100 feet west of the edge of Route 13 [the State highway] pavement and facing easterly toward the hamlet, suggests that the location of Route 13, which seems to be in a slight hollow, could easily be overlooked by a driver proceeding east; the county road seems to continue westerly into a slight dip, up a grade into the hamlet. Drivers, in the absence of some key to attention or notice, would ordinarily expect to find intersecting roads within small hamlets rather than skirting them on the outer edge.”
It should also be borne in mind when studying photographs to determine visibility that visibility should be examined from the point of view, circumstances and faster movement of a person driving a car such as the deceased Charlotte Sebring, rather than from the point of view of a person standing or walking about the highway and taking pictures. In addition, it must be remembered that the accident occurred on a blustery wintry day with the wind blowing snow from snowbanks along the highway, which condition would further diminish the degree of visibility. If the STOP sign had been at the intersection at the time of the collision, it is presumed that Miss Sebring would have obeyed it. The presumption is that she would not have committed the offense of not obeying it. That she would have seen the sign, that she would then have obeyed it and avoided the accident are not susceptible of positive proof and must be left to inference and presumption.
Accordingly, the judgment should be affirmed upon the ground that the preponderance of the evidence supports the unanimous *13 determination of the Appellate Division rather than that of the Court of Claims.
Judges Desmond, Fuld, Frobssel and Burke concur with Judge Dye; Chief Judge Conway dissents in an opinion; Judge Van Voorhis dissents and votes to affirm upon the ground that the route marker “ N. Y. 13 L-B ” was an inadequate warning sign of the concealed crossing of Boute 13 only a few feet beyond; and that its presence was a false indication that the highway crossing was at a greater distance, instead of being — as it was — almost immediately adjacent to the sign.
In each action: Judgment of the Appellate Division reversed and that of the Court of Claims reinstated, with costs in this court and in the Appellate Division.